Minute Order Form (06/97)

## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Matthew F. Kennelly | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 4346 | **DATE** | 10/1/2003 |
| **CASE TITLE** | Commodity Futures vs. Michael Zelener | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____. .

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
  ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons set forth on the attached Memorandum, Opinion and Order, plaintiff's motion for preliminary injunction is denied, and the case is dismissed. Judgment is entered dismissing plaintiff's claims. AlaronFX's motion to dismiss, and all other pending motions are terminated as moot. The restraining order entered on 6/24/03 is dissolved. For reasons also set forth on the order, the dissolution of these orders is stayed through 10/13/03 with respect to funds being held by AlaronFX and in the accounts of Markham and Amgine so that plaintiff may, if it wishes, seek a further stay from the Court of Appeals.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | Document Number |
|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | | |
| | No notices required. | | number of notices | | |
| | Notices mailed by judge's staff. | | | | |
| | Notified counsel by telephone. | | OCT 06 2003 | | |
| ✓ | Docketing to mail notices. | | date docketed | | 40 |
| | Mail AO 450 form. | | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | | | |
| OR | courtroom deputy's initials | | date mailed notice | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | | |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| COMMODITY FUTURES TRADING COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | Case No. 03 C 4346 |
| MICHAEL ZELENER; AMGINE INC., f/d/b/a British Capital Group; MARKHAM & CO., d/b/a British Capital Group; and ALARONFX, | ) ) ) ) ) | |
| Defendants. | ) ) | |



**MEMORANDUM OPINION AND ORDER**

MATTHEW F. KENNELLY, District Judge:

In late June 2003, the Commodity Futures Trading Commission sued Michael Zelener, Amgine Inc., Markham & Co., and AlaronFX, Inc. Zelener is the president and controlling person of Amgine and Markham, which did business under the name British Capital Group. AlaronFX is a dealer in foreign currency and foreign currency options contracts.

In its complaint, the CFTC alleged that since April 2001, Zelener and BCG had "operated a foreign currency boiler room" that had solicited around $4 million from some 238 retail customers "to engage in speculative trading of foreign currency ('forex') futures at [AlaronFX]." Pltf. Br. in Supp. of Mot. for Statutory *Ex Parte* Restraining Order and Prelim. Inj. at 1-2. The CFTC contended that BCG had fraudulently solicited customers with high-pressure tactics, false promises of large profits with limited risks, misleading promotional material, and material omissions about BCG's compensation arrangement with AlaronFX. *Id.* at 2. The CFTC alleged

that all but one of BCG's customers had lost money in 2002, a total loss of more than $1.4 million; during that same year BCG had collected $1.4 million in compensation from AlaronFX. *Id.* The CFTC alleged that Zelener, Amgine and Markham (to which we will refer collectively as "the BCG defendants") had violated the anti-fraud provisions of the Commodity Exchange Act, 6 U.S.C. §6b(a)(2)(i) & (iii). It sought a temporary restraining order and preliminary injunction freezing the BCG defendants' assets and directing all of the defendants to preserve records and provide the CFTC with access to those records.

On June 24, 2003, the day the complaint was filed, the Court granted the CFTC's motion for an *ex parte* restraining order against all of the defendants. The order had the effect of freezing the assets of Zelener and the other BCG defendants and directing the defendants to preserve and give the CFTC access to relevant records. In late July, AlaronFX consented to a preliminary injunction which, among other things, barred it from transferring funds that it was holding for the benefit of Amgine and/or Markham. At the same time, the CFTC and Zelener, who at that point had appeared *pro se,* agreed to modify the TRO to permit Zelener to pay certain living expenses. They were unable to agree on further proposed modifications, however, so the Court set the matter for a hearing on the CFTC's motion for a preliminary injunction as to the BCG defendants and stated that the TRO would expire unless the CFTC was able to persuade the Court to issue a preliminary injunction.

A preliminary injunction hearing was held on September 17-19, 2003. In his pre-hearing brief, Zelener and the other BCG defendants, now represented by counsel, argued that the Court lacked jurisdiction over the case because the trading at issue did not involve futures contracts and thus the Commodity Exchange Act did not apply.

2

At the hearing, the Court was persuaded that BCG had systematically defrauded its customers. Among other things, the evidence showed that prospective customers were told, both verbally and in BCG's written materials, that BCG would make money only if the customer did – in other words, only if the customer's trades were successful.[1] This was a significant inducement for prospects to invest their funds with BCG; they knew, or at least were led to believe, that the company and its traders had a powerful inducement to make trades wisely and well. But in fact the representation was untrue. Unbeknownst to its customers, BCG had a deal with AlaronFX by which it received half of AlaronFX's take on each trade – the bid-ask spread that existed at the time of the trade – whether BCG's customer made or lost money. This was how BCG made virtually all of its money, and it was done not only without a hint of it to BCG's customers, but in the face of affirmative misrepresentations that BCG was, in effect, just as much at risk as the customer was. Each and every customer of BCG received written materials that contained the misrepresentation, including materials from AlaronFX which were likewise false. For these reasons, the CFTC made out a strong case that each customer was the victim of a fraud, that the funds BCG had obtained and those held for it by AlaronFX should be held in constructive trust – i.e., frozen – for the benefit of the defrauded customers, and that the BCG defendants should be preliminarily enjoined from engaging in further solicitation of customers. (In contrast, the CFTC failed to establish a basis for an ongoing freeze of Zelener's personal assets; it made no effort to show that any of the assets Zelener now possesses were the proceeds of his or BCG's fraud.)

---

[1] The exception to this disclosed in BCG's written materials involved a modest management fee.

This would be the end of the story were it not for the fact that the BCG defendants have challenged the Court's jurisdiction. They argue that the statutes in question extend only to trade in futures (and options, though that is not an issue here), and that BCG was trading "spot" contracts, not futures contracts. It is not entirely clear to the Court whether this is actually a challenge to the Court's subject matter jurisdiction or simply an argument that the CFTC cannot state a claim under the statute which serves as the predicate for this lawsuit. But either way, it is undisputed that unless the CFTC can show that BCG was trading futures contracts, it cannot maintain this action.

The CFTC has jurisdiction to regulate "transactions involving contracts of sale of a commodity for future delivery." 7 U.S.C. §2(a)(1)(A); *see generally Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran,* 456 U.S. 353, 357-67 (1982). When Congress created the CFTC in 1974 and expanded the statute's coverage to include non-agricultural commodities, it also enacted an exemption referred to as the "Treasury Amendment," which initially provided as follows:

> Nothing in this chapter shall be deemed to govern or in any way be applicable to transactions in foreign currency, security warrants, security rights, resales of installment loan contracts, repurchase options, government securities, or mortgages or mortgage repurchase commitments, unless such transactions involve the sale thereof for future delivery conducted on a board of trade.

7 U.S.C. §2(ii) (1974), *quoted in Dunn v. CFTC,* 519 U.S. 465, 469 (1997). In *Dunn,* the Supreme Court held that this statute exempted transactions in options to buy or sell foreign currency from CFTC regulation, concluding that the Treasury Amendment amounted to "a complete exclusion of [foreign currency transactions] from the regulatory scheme," except to the extent they were conducted on a board of trade. *Id.* at 476.

4

Following *Dunn,* the statute was amended to give the CFTC authority to regulate any

agreement, contract, and transaction in foreign currency "that is a contract of sale of a commodity

for future delivery (or an option on such a contract) or an option (other than an option executed

or traded on a national securities exchange), offered to or made with a person other than a

financial institution, insurance company, financial holding company, investment bank holding

company, or broker-dealer (or associated person of a broker-dealer) registered under the

Securities Exchange Act. 7 U.S.C. §2(c)(2)(B). The CFTC does not contend that the

transactions offered and made by BCG were options, and thus unless they were "contract[s] of

sale of a commodity for future delivery," the Commodity Exchange Act, including the anti-fraud

provision upon which the CFTC relies as the sole basis for its claims in this case, does not apply.

In support of its contention that BCG was offering and trading in futures contracts, the

CFTC has offered two affidavits of Ronald Hobson, who has served since 1976 in the Office of

the Chief Economist of the CFTC, currently as an Industry Economist. In his initial affidavit,

Hobson explained the distinctions between "futures," "forward," and "spot" transactions.

A futures contract is an agreement between parties for the future delivery of a commodity

at a price agreed upon today. Its principal purpose is to transfer price risk rather than ownership

of the underlying commodity. Delivery of the commodity is possible but rare, as trading

generally involves mechanisms that permit the parties to avoid delivery, either by cash settlement

or entering into an offsetting transaction. Hobson Aff. ¶ 12.

A forward contract is likewise a contract for future delivery at a price agreed upon today,

but its primary purpose is to facilitate the sale and delivery of the physical commodity and, in

particular, to assure the commodity's availability at a date in the future when it will be needed.

5

Given the purpose of a forward contract, generally speaking there is no established mechanism for offset or cash settlement. *Id.* ¶ 16.

A spot transaction, Hobson states, is a transaction for immediate delivery of a commodity. Persons holding the commodity may experience gains or losses in its value and thus may speculate on price movements, but in contrast with futures contracts, there is no counterparty holding the opposite price risk. "[A] speculator who purchases and holds a commodity for the purpose of speculation also takes on the costs and risks attendant to holding a physical position, such as storage costs and the risks of theft and deterioration." *Id.* ¶ 18.

Looking at the trading conducted by BCG for its customers, Hobson described the pattern as follows. BCG offered trades in Japanese yen, Euros, British pounds, and Swiss francs, effected with AlaronFX. The price of the currency was set at the time of the trade. The customer entered into a transaction either to buy or sell the currency. At some later point, "the position in the currency is closed with no apparent transfer of currency," other than the profit or loss experienced by the customer. Though not specifically explained by Hobson in his affidavit, the Court's understanding based on the evidence is that what BCG typically did was to enter into, on the customer's behalf, an offsetting transaction that would prevent the need to deliver or take delivery of the underlying currency. "In this regard," Hobson states, "BCG's open positions are consistent with futures trading where contracts are closed at some opportune future date. Through BCG, customers are essentially exposed to future foreign exchange movements as if they were purchasing or selling foreign currency at some point in the future at today's foreign exchange rates." *Id.* ¶ 24. The transactions were entirely paper transfers; no actual delivery appears to have occurred. *Id.* ¶¶ 25-26. For these reasons, Hobson concludes, "[t]he BCG

6

contracts therefore possess all the characteristics of a futures contract." *Id.* ¶ 27.

For their part, the BCG defendants submitted an affidavit from Edgar Ramon, the Managing Director of AlaronFX. Ramon stated that in each of the trades made by BCG for its customers, AlaronFX was the counter-party with whom the BCG customer traded; it was not an agent to place trades elsewhere. Ramon Aff. ¶¶ 6-7. AlaronFX's customer agreement, to which BCG's customers were all parties, characterized the trades as spot contracts and stated that all trades would be settled within 48 hours. *Id.* ¶ 8. On the business day on which the trade was made, the trade was "marked to market" and was posted to the BCG customer's account. *Id.* ¶ 9. "The BCG customer's position was then held and automatically rolled over until the BCG customer took delivery in the foreign currency consistent with the Customer Agreement or the BCG customer took an offsetting position, *i.e.,* selling a previously bought currency or buying a previously sold currency." *Id.* ¶ 13. To Ramon's knowledge, no BCG customer ever requested delivery of the currency, *id.* ¶ 15; rather, it appears, offsetting transactions were always entered into, thereby avoiding the need for delivery.

Neither Hobson nor Ramon was called to testify at the hearing; both sides were satisfied with their submission of affidavits. The Court is not persuaded by Hobson's characterization of BCG's activities as trading in futures. What Hobson appears to contend is that when a person speculates in "spot" trades by holding positions and entering into offsetting trades, thus avoiding delivery of the commodity, then his trades amount to transactions in futures contracts. This, in the Court's view, is a *non sequitur*. As best as the Court can tell, in the only two reported

7

decisions in which a similar argument was made, it was rejected.[2] In *Bank Brussels Lambert,*

*S.A. v. Intermetals Corp.,* 779 F. Supp. 741 (S.D.N.Y. 1991), the court considered a private

party's claim that the Commodity Exchange Act's anti-fraud provisions covered similar foreign

exchange trading:

> IM contends that because BBL would roll over IM's positions, buying one spot
> contract after another, thus perpetuating the speculation on a currency over a more
> extended period of time than contemplated by a single spot transaction, this
> trading should be deemed to be trading in futures contracts under the coverage of
> the [Commodity] Exchange Act. The argument is misconceived. The Act does
> not purport to cover all speculation in foreign currencies that is extended over a
> substantial period of time. It covers futures contracts. One can, of course,
> speculate in a foreign currency over a lengthy period simply by establishing a
> position in that currency and maintaining that position for as long as one wishes to
> speculate before converting it back to U.S. dollars, or by contracting that future
> payments due for goods or services be made in a designated foreign currency. If
> the foreign currency strengthens in relation to the U.S. dollar in the meantime, one
> will have profited; if it weakens, one will have lost. Such transactions would not
> fall within the regulation of the [Commodity] Exchange Act, notwithstanding that
> they involved long-term speculation in a foreign currency, because they would not
> involve contracts for futures. Here, although BBL maintained IM's speculative
> positions for substantial periods, at no moment did BBL establish a speculative
> position calling for future delivery beyond the two day terms of the current "spot"
> market. BBL never purchased a futures contract for IM.

*Id.* at 748-49 (footnote omitted).

In *CFTC v. Frankwell Bullion Ltd.,* No. C-94-2166 DLJ, 1994 WL 449071 (N.D. Cal.

Aug. 12, 1994), the court reached the same conclusion regarding foreign currency trading similar

to that conducted by BCG. The court concluded that a key defining characteristic of a futures

contract – a fixed delivery date and a fixed price at which the customer must liquidate the

contract – was "noticeably absent." *Id.,* at *2 (citing *Chicago Mercantile Exchange v. SEC,* 883

---

[2] *CFTC v. American Metal Exchange Corp.,* 693 F. Supp. 168 (D.N.J. 1988), the only
case cited by the CFTC in this regard, is inapposite because it did not involve foreign exchange
trading.

F.2d 537, 546 (7th Cir. 1989)). By contrast, the court stated, the contracts traded by the

defendant (like those traded by BCG) were "liquidated not on the basis of a value determined at

the time of contracting, but at a market value determined at the time of sale." *Id.*

The same is true in this case. BCG's customers were not trading in futures contracts;

rather they were speculating in spot contracts by rolling over positions and entering into

offsetting trades. The manner of the customers' overall trading, and the purpose for which it was

conducted, does not serve to transmute spot trading to trading in futures. As the court put it in

*Bank Brussels Lambert,* the statute "limits its coverage and the CFTC's jurisdiction to futures. It

does not cover the spot market, *regardless of the motivation of the transactions.*" *Id.* at 750

(emphasis added).

For these reasons, the Court concludes that the CFTC lacks jurisdiction over the trading

in question and that the trades were not subject to the Act's anti-fraud provisions. This is

unfortunate, for as noted earlier the evidence submitted at the hearing clearly showed, in this

Court's view, that BCG engaged in a systematic fraud against its customers. But although the

CFTC cannot maintain this case, that does not leave customers in this or similar situations

without protection: they may, of course, bring private suits alleging fraud, and other

governmental agencies – such as, for example, state attorneys general – likely can bring suit

under state consumer protection laws. The CFTC may wish to consider a prompt referral of this

matter to one or more of these other agencies so that the interests of BCG's customers can be

protected.

### Conclusion

For the reasons stated above, plaintiff's motion for a preliminary injunction is denied, and

9

the case is dismissed. The Clerk is directed to enter judgment dismissing plaintiff's claims. AlaronFX's motion to dismiss [docket #20-1], and all other pending motions [docket #33-1] are terminated as moot. The restraining order entered on June 24, 2003 and later extended, and the consent preliminary injunction entered on July 23, 2003 are dissolved. Because this ruling presents a significant question regarding the coverage of the Commodity Exchange Act, and for the other reasons noted above, the dissolution of these orders is stayed through October 13, 2003 with respect to funds being held by AlaronFX and in the accounts of Markham and Amgine so that plaintiff may, if it wishes, seek a further stay from the Court of Appeals. The Court declines, however, to stay the dissolution of the freeze on Zelener's personal assets.

_____
MATTHEW F. KENNELLY
United States District Judge

Date:   October 3, 2003

10